IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF STOCKTON,<br><br>   Plaintiff,<br><br>   v.<br><br>BANK OF AMERICA, N.A., et al.,<br><br>   Defendants<br>_____/ | No. C-08-4060 MMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR REMAND; SETTING BRIEFING SCHEDULE ON PLAINTIFF'S SUPPLEMENTAL BRIEF** |

   Before the Court is plaintiff City of Stockton's ("Stockton") "Motion for Remand to State Court," filed September 10, 2008. Defendants AIG Financial Products Corp. and AIG SunAmerica Life Assurance Company (collectively, "AIG"), have filed opposition, in which defendants Bank of America, N.A., and Banc of America Securities LLC (collectively, "Bank of America") have joined. Stockton has filed a reply. The matter came on regularly for hearing October 31, 2008. Joseph W. Cotchett, Nanci E. Nishimura, and Stuart Gross of Cotchett, Pitre & McCarthy appeared on behalf of Stockton. Reginald D. Steer and Amit Kurlekar of Akin Gump Strauss Hauer & Feld LLP appeared on behalf of AIG. Brenda N. Buonaiuto of King & Spaulding LLP appeared on behalf of Bank of America. Having read and considered the parties' written submissions and oral arguments, the Court hereby

//

rules as follows.[1]

## BACKGROUND

In its complaint, filed in state court on July 23, 2008, Stockton alleges it "is frequently engaged in infrastructure projects which require the issuance of municipal bonds" and that it "also issues tax revenue anticipation notes." (See Compl. ¶ 13.) Stockton additionally alleges that, after it issues such bonds and notes, it invests portions of the proceeds in "municipal derivative instruments," (see Compl. ¶¶ 1, 13), which "come in two basic types," (see Compl. ¶ 1). The "most common" type, according to plaintiff, is a "Guaranteed Investment Contract ('GIC')," and the "second type" consists of "interest rate hedging opportunities," such as "swaps, options, and swaptions." (See id.) At the hearing conducted October 31, 2008, Stockton clarified that although the complaint referred to several types of municipal derivative instruments, the only such instruments at issue herein are GICs.

Stockton's claims arise from its allegation that defendants, which consist of providers of GICs and brokers who acted on behalf of Stockton, "conspired to decrease the returns that public entities earned on [GICs] by allocating the Municipal Derivative market amongst themselves and rigging the bidding process by which public entities acquired

//
//
//
//

---

[1] On November 7, 2008, Stockton filed five notices of voluntary dismissal, by which it dismissed its claims against each of the five foreign entity defendants. That same date, Stockton filed a Supplemental Brief, in which it argues that, in light of such subsequent development, the Court should remand the instant action. By the instant order, the Court has addressed the issue of whether the Court has jurisdiction over the complaint as it existed at the time of removal. See Libhart v. Santa Monica Dairy Co., 592 F. 2d 1062, 1064 (9th Cir. 1979) ("In determining the existence of removal jurisdiction based upon a federal question, [a court] must look to the complaint as of the time the removal petition was filed.") Accordingly, the Court construes Stockton's Supplemental Brief as a separate motion, i.e., a motion for discretionary remand, grants AIG's request to file an opposing brief by November 17, 2008, and affords Stockton the opportunity to file a reply thereto, no later than November 21, 2008, at which time such additional motion will stand submitted.

[GICs]."  (See Compl. ¶ 1.)  Stockton describes the alleged conspiracy as follows:

> Defendants would decide prior to the initiation of bidding on a particular Municipal Derivative which [d]efendant would win the bid.  Other [d]efendants would then either submit no bid at all or 'courtesy bids' that gave the bidding process the veneer of legitimacy.  Often the pre-selected winner would also be given a 'last look' by the broker in charge of the particular bidding process to ensure that the bid of the pre-selected winner submitted would be just high enough to win and police compliance by the other [d]efendants in the conspiracy.  The illegal profits created by this illegal behavior were often secretly shared amongst members of the conspiracy to ensure their continued participation and hide these profits from authorities.

(See Compl. ¶ 4.)  According to Stockton, it has "suffered financial loss" as a result of the alleged conspiracy.  (See Compl. ¶ 12.)

By the instant action, Stockton alleges two claims, both of which seek relief under California law.  Stockton's First Cause of Action, brought under the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16758, is based on the allegation that all of the defendants, including the five foreign defendants recently dismissed from the case, conspired to "fix[ ] the bidding process."  (See Compl. ¶ 127.)  Stockton's Second Cause of Action, a claim for "fraud and deceit," is based on the allegation that each of the defendants made "material misrepresentations and omissions" to Stockton, "including but not limited to entering bids that they knew were never intended to be competitive."  (See Compl. ¶ 134.)

On August 23, 2008, AIG filed a Notice of Removal, in which it asserts the district court has original jurisdiction over Stockton's claims under 28 U.S.C. § 1331 and under the Edge Act, 12 U.S.C. § 632.

**DISCUSSION**

Stockton seeks an order remanding the instant action to state court.  Stockton argues the removal is procedurally defective in that AIG failed to obtain the other defendants' consent to removal, and, further, the removal is deficient in that AIG has failed to establish federal jurisdiction.

**A.  Unanimity Requirement**

**1.  Removal Under 28 U.S.C. § 1331 (General Federal Question Jurisdiction)**

28 U.S.C. § 1441, which applies to "actions removable generally," provides that

3

"[ex]cept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." See 28 U.S.C. § 1441. The phrase "the defendant or the defendants" has been interpreted to mean that in a case with more than one defendant, "all the defendants must join in the application [to remove]." See Chicago, Rock Island, & Pacific Railway Co. v. Martin, 178 U.S. 245, 247-48 (1900) (interpreting predecessor to 28 U.S.C. § 1441(a)). The only defendants that need not join in a notice of removal are "nominal, unknown, or fraudulently joined parties." See Emrich v. Touche Ross & Co., 846 F. 2d 1190, 1193 n. 1 (9th Cir. 1988).

Here, no defendant joined in the notice of removal, and, to the extent AIG relies on 28 U.S.C. § 1331, AIG does not argue that any exception to the general rule of unanimity exists.

Accordingly, the Court finds AIG has failed to show the instant action was properly removed pursuant to § 1331.

**2. Removal Under 12 U.S.C. § 632 (the Edge Act)**

Section § 632, which, as discussed infra, allows for removal of certain types of suits involving banking or financial operations, provides that "any defendant in any such suit may . . . remove such suit[ ] from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise provided by law." See 12 U.S.C. § 632.

In Wenzoski v. Citicorp, 480 F. Supp. 1056 (N.D. 1979), the district court found the phrase "any defendant" is properly interpreted to mean that the removing defendant need not obtain consent from any other defendant. See id. at 1058 (distinguishing phrase "the defendant or the defendants" used in § 1441(a)). The holding in Wenzoski is consistent with the ordinary meaning of the word "any." See id.; see also Chicago, Rock Island, & Pacific Railway Co., 178 U.S. at 247-48 (distinguishing "one or more of the defendants"

1 from "the defendant or defendants"; holding former does not require unanimity, while latter
2 does).[2]

3 Stockton argues that if "any defendant" were interpreted to allow removal by less
4 than all of the defendants, § 632's requirement that removal thereunder "follow[ ] the
5 procedure for the removal of causes otherwise provided by law" would be rendered a
6 nullity, because, according to Stockton, the "procedure for the removal otherwise provided
7 by law" requires all defendants join in the removal. The procedures for removal are set
8 forth in 28 U.S.C. § 1446. See 28 U.S.C. § 1446(a) (requiring, inter alia, notice of removal
9 be "signed pursuant to Rule 11 . . . and contain[ ] a short and plain statement of the
10 grounds for removal"). Section § 1446 does not address the subject of unanimity.

11 Accordingly, the Court finds the instant removal was not improper by reason of any
12 lack of unanimity.

### B. Subject Matter Jurisdiction

14 Section 632 provides, in relevant part, that "all suits of a civil nature at common law
15 or in equity to which any corporation organized under the laws of the United States shall be
16 a party, arising out of transactions involving international or foreign banking . . . or out of
17 other international or foreign financial operations, either directly or through the agency,
18 ownership, or control of branches or local institutions in dependencies or insular
19 possessions of the United States or in foreign countries, shall be deemed to arise under the
20 laws of the United States." See 12 U.S.C. § 632.

21 The instant complaint names as defendants twenty-nine entities that provide GICs
22 and twelve brokers retained to facilitate that activity. According to the complaint, the
23 twenty-nine providers agreed that whenever a public entity, through a broker, sought
24 submission of bids for a GIC, the providers and brokers would decide in advance which

---

[2] Stockton's reliance on Ponce Federal Bank, FSB v. Instituto Medico Del Norte, Inc., 643 F. Supp. 424 (D. P.R. 1986), is unavailing, for the reason that the district court's analysis therein was dependent on an erroneous assumption that § 1441(a) uses the phrase "a defendant or defendants." See id. at 425-36 (stating: "Section 1441(a) refers to 'a defendant or defendants . . . . It is a well-established rule under 28 U.S.C. § 1441(a) that all the defendants . . . must be joined in the removal petition.")

5

provider would submit the "winning" bid, (see Compl. ¶ 4), and which providers would submit either "no bid at all" or noncompetitive bids, i.e., "'courtesy bids' that gave the bidding process the veneer of legimitacy," (see id.). Stockton alleges that the GIC providers and brokers, by such agreement, were able to fix the bidding process, such that the public entity, e.g., Stockton, received less of a return on the investment than it would have earned had the providers actually competed.

### 1. Banking

As alleged in the complaint, the twenty-nine above-referenced providers include a number of foreign and domestic banks. Stockton argues, however, that the provision of GICs by those banking institutions does not constitute "banking" under § 632 because, according to Stockton, such activity does not constitute a "traditional banking activity." See Diaz v. Pan American Federal Savings and Loan Ass'n, 635 F. 2d 30, 32 (1st Cir. 1980) (holding district court lacked jurisdiction under § 632 where claim against bank was based on bank's alleged malicious prosecution of criminal action for passing bad checks; noting, "a commonsense approach to a statute principally concerned with financial transactions of an international character suggests that 'banking' includes only traditional banking activities"). In support of its argument that the provision of GICs is not a traditional banking activity, Stockton notes that GICs have, in certain contexts, been characterized as annuities, and that annuities are commonly understood to be a form of "insurance business." See Texas Commerce Bank v. Garamendi, 11 Cal. App. 4th 460, 465 (1992).

The term "traditional banking activities" does not appear in § 632. Further, nothing in Diaz or in any other case in which the concept has been discussed, suggests the term "traditional" as used in such cases is meant to do any more than distinguish between acts commonly understood to involve the services offered and business conducted by banks, as opposed to activities that have little to no connection to the business of banking, such as the filing of a malicious lawsuit. See Diaz, 635 F. 2d at 32; see also Bank of New York v. Bank of America, 861 F. Supp. 225, 232-33 (S.D. N.Y. 1994) (holding bank's agreement to engage in exclusive negotiations to purchase assets not "traditional banking" activity).

1    Here, the activity at issue constitutes a service offered by the defendant banks. In particular, as alleged in the complaint, where a public entity such as Stockton has issued one or more bonds and has proceeds from such issuances available for investment in a GIC, the GIC provider "guarantee[s] a fixed or variable rate of interest or a future payment that is based on an index or similar criteria that is payable at a predetermined date." (See Compl. ¶ 69.) As further set forth in the complaint, a "GIC is analogous to a hybrid of a certificate of deposit and a savings account." (See Compl. ¶ 67.) Certificates of deposit and savings accounts are, undeniably, a "traditional" aspect of banking activities.

To the extent Stockton relies on its allegation that entities other than banks are entitled to provide GICs, (see, e.g., Compl. ¶ 81 (alleging entities providing GICs are "the largest banks, insurance companies, and financial institutions in the world")), Stockton cites to no case, and the Court has located none, interpreting "banking," as used in § 632, to cover activities that can only be performed by a bank. Indeed, to the extent relevant authority exists, such authority is to the contrary; a mortgage agreement with a bank, for example, is considered a transaction "involving banking," see, e.g., Conjugal Society v. Chicago Title Ins. Co., 690 F. 2d 1, 5 (1st Cir. 1982), although banks are not the exclusive providers of mortgages.

Accordingly, the Court finds the provision of GICs by banks constitutes "banking" under § 632.

**2. Transaction Involving International or Foreign Banking**

Stockton argues the claims at issue herein are not claims that arise out of a transaction "involving international or foreign banking." See 12 U.S.C. § 632. In essence, Stockton argues the instant claims arise from its investment in one or more GICs and that there is no allegation that any such GIC was provided by other than a domestic entity. The Court disagrees.

//
//
//

7

Contrary to Stockton's argument, Stockton's claims do not "arise" out of any such GIC transaction, and, indeed, no such transaction is even identified in the complaint.[3] Rather, Stockton's claims arise out of the agreement alleged to have been entered into by the named defendants. It is that unlawful "transaction" and the defendants' conduct thereunder that constitutes the basis of the Cartwright Act claim and the common law claim. Indeed, the complaint itself alleges that "[t]his action arises from the illegal and unlawful acts of the [d]efendants, who conspired to decrease the returns that public entities earned on [GICs] by allocating the Municipal Derivative market amongst themselves and rigging the bidding process by which public entities acquired [GICs]." (See Compl. ¶ 1.)

Moreover, such "transaction" is, as discussed above, an alleged illegal agreement between foreign banks and others and, as a result, necessarily "involves" international or foreign banking. In particular, the complaint alleges that the defendant foreign banks, to further the illegal agreement at issue herein, determined the manner in which they would bid on and provide GICs at the time Stockton sought the submission of bids, and that such actions by the foreign banks caused harm to Stockton. (See Compl. ¶¶ 18, 32, 35, 29, 40 (alleging each foreign provider named as defendant to complaint "engaged in the misconduct that led to the harm suffered by [Stockton]").) The fact that a relatively small percentage of the GIC providers are foreign banks does not alter the analysis; "'a suit satisfies the jurisdictional requisites of Section 632 if any part of it arises out of transactions involving international or foreign banking.'" See Pinto v. Bank One Corp., 2003 WL 21297300, at *3 (S.D. N.Y. 2003) (quoting In re Lloyd's American Trust Fund Litig., 928 F. Supp. 333, 338 (S.D. N.Y. 1996); see also Pinto, 2003 WL 21297300, at *3 (holding "five transactions" involving international banking, although "represent[ing] a small portion of the

---

[3]Stockton alleges that it invested in "Municipal Derivatives," identified at the October 31, 2008 hearing as being GICs, and that such investment(s) "occurred after bidding processes involving [d]efendants." (See Compl. ¶ 13.) Such allegation does not, however, identify the "transaction" from which Stockton's claims arise; rather, such allegation, if true, establishes Stockton's standing to seek relief from defendants as a result of their having agreed to engage in the "bid rigging and market allocation scheme," (see Compl. ¶ 4), alleged in the complaint.

total listed," was "sufficiently foreign to meet the requirements of [§ 632]").

Further, to the extent the "involvement" of international or foreign banking activities must be "legally significant" in order to confer jurisdiction under § 632, see Bank of New York, 861 F. Supp. 225, 233 (S.D. N.Y. 1994), such requirement is satisfied here, because, at least as currently pleaded, the involvement of the foreign banks identified in the complaint is necessary to effectuate the unlawful agreement. See, e.g., Ostrofe v. H. S. Crocker Co., Inc., 740 F. 2d 739, 745-46 (9th Cir. 1984) (holding "scheme to eliminate competition in the marketing of labels by fixing prices and allocating customers" could "not succeed without" participation of all competing label providers).

Finally, even if the Court were to accept Stockton's argument that the transaction(s) out of which Stockton's claims arise are its agreement(s) to invest in one or more individual GICs, any such transaction is, as discussed above, alleged to be the result of the alleged illegal agreement among the defendants, both foreign and domestic, and the banking activity conducted thereunder. (See Compl. ¶ 3 (alleging that as a result of defendants' illegal agreement, Stockton received "artificially depressed" rate of return and was "forced to pay inflated fees and costs").)

Consequently, irrespective of whether Stockton's claims are deemed to arise out of the defendants' alleged illegal agreement or out of Stockton's investment in one or more individual GICs, the Court finds Stockton's claims arise out of transactions that involve international or foreign banking.[4]  Accordingly, the Court has jurisdiction over Stockton's complaint.

**CONCLUSION**

For the reasons stated above, plaintiff's motion for remand is hereby DENIED.

**IT IS SO ORDERED.**

Dated: November 13, 2008

MAXINE M. CHESNEY
United States District Judge

---

[4] In light of this finding, the Court does not consider whether Stockton's claims arise out of "other international or foreign financial operations." See 12 U.S.C. § 632.